UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| | NO.  10-204 |
| KENNETH BOWEN | |
| ROBERT GISEVIUS | |
| ROBERT FAULCON | SECTION  "N"  (1) |
| ANTHONY VILLAVASO | |
| ARTHUR KAUFMAN | |
| GERARD DUGUE | **\*\*Order Does Not Apply to Mr.  Dugue\*\*** |

## <u>ORDER AND REASONS</u>

This matter is before the Court for sentencing.

At the conclusion of a jury trial, defendants Kenneth Bowen, Robert Gisevius, Robert

Faulcon, Anthony Villavaso, and Arthur Kaufman were found guilty, on August 5, 2011, of multiple

counts of a 25-count redacted indictment.[1] Specifically, Kenneth Bowen was found guilty of Counts

1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 19, and 20; Robert Gisevius was found guilty of Counts 1, 2, 3, 4,

5, 6, 7, 11, 12, 13 and 21; Robert Faulcon was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12

_____

[1]        Redacted Indictment is Rec. Doc. 566-1.

and 22; Anthony Villavaso was found guilty of Counts 1, 2, 3, 4, 5, 6, 7, 11, 12 and 23; and Arthur Kaufman was found guilty of Counts 11, 12, 13, 14, 15, 16, 17, 18, 24, and 25.

The (redacted) indictment charges as follows as to these defendants:[2]

Counts 1, 3, 4, 5, and 6 charge that defendants Bowen, Gisevius, Faulcon, and Villavaso, while acting under color of law, and aiding and abetting one another, willfully deprived James Brissette, Susan Bartholomew, Leonard Bartholomew, Lesha Bartholomew, and Jose Holmes, respectively, of the right, secured by the Constitution of the United States, to be free from the use of unreasonable force by a law enforcement officer, in violation of 18 U.S.C. § 242.

Counts 2 and 7 of the indictment charge defendants Bowen, Gisevius, Faulcon, and Villavaso with "using" and "Carrying" a firearm during and in relation to a crime of violence; and "possessing" a firearm in furtherance of a crime of violence; specifically, with Count 2, the civil rights offense charged in Count 1, and with Count 9, the civil rights offenses charged in Counts 3, 4, 5, and 6, all in violation of 18 U.S.C. § 924(c).

Count 8 as to defendant Faulcon, and Count 10 as to defendant Bowen, charge that the named defendant, while acting under color of law, willfully deprived Ronald Madison of the right, secured by the Constitution of the United States, to be free from the use of unreasonable force by a law enforcement officer, in violation of 18 U.S.C. § 242.

Count 9 of the indictment charges defendant Faulcon with "using" and "carrying" a firearm during and in relation to a crime of violence; and "possessing" a firearm in furtherance of a crime

---

[2]        Counts do not reflect those applicable to Dugue.

of violence; specifically the civil rights offense charged in Count 8, all in violation of 18 U.S.C. § 924(c).

Count 11 of the indictment charges that defendants Bowen, Gisevius, Faulcon, Villavaso, and Kaufman, along with others known to the grand jury, including Sergeant Gerard Dugue, Lieutenant Michael Lohman, and Detective Jeffrey Lehrmann, conspired to commit an offense against the laws of the United States, in violation of 18 U.S.C. § 371. The unlawful purpose of the conspiracy offense was to commit one or more of the three underlying offenses, which are: (1) to obstruct justice by falsifying evidence, in violation of 18 U.S.C. § 1519; (2) to obstruct justice by engaging in misleading conduct, in violation of 18 U.S.C. § 1512(b)(3); and (3) to make false statements in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. § 1001.

Count 12 of the indictment charges that defendants Bowen, Gisevius, Faulcon, Villavaso, and Kaufman conspired with each other, and others known to the grand jury, to deprive Jose Holmes of the constitutional right to freedom from criminal prosecution based on false evidence, in violation of 18 U.S.C. § 241.

Count 13 of the indictment charges that defendants Bowen, Gisevius, and Kaufman conspired with each other, and others known to the grand jury, to deprive Lance Madison of the constitutional right to freedom from criminal prosecution based on false evidence, in violation of 18 U.S.C. § 241.

Counts 14, 15, 17, and 24 charge defendant Kaufman with obstruction of justice by falsifying evidence, in violation of 18 U.S.C. § 1519.

Counts 16, 18, and 25 charge defendant Kaufman with making false statements in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. § 1001.

Counts 19 and 20 charge defendant Bowen with obstruction of justice by engaging in misleading conduct, in violation of 18 U.S.C. § 1512(b)(3).

Counts 21, 22, and 23 charge obstruction of justice by engaging in misleading conduct in violation of 18 U.S.C. § 1512(b)(3). Count 21 charges defendant Gisevius, Count 22 charges defendant Faulcon, and Count 23 charges defendant Villavaso.

After trial ended, the Court granted Motions for Judgments of Acquittal as to defendant Bowen with respect to Count 10; as to defendants Bowen, Gisevius, Faulcon and Villavaso with respect to Count 12; and as to defendants Bowen and Gisevius with respect to Count 13.[3]

18 U.S.C. § 3553(a) provides the legal basis for the Court to consider in imposing a sentence. This section instructs that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider these factors:

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)     the need for the sentence imposed –
>
> > (A)     to reflect the seriousness of the offense, to promise respect for the law, and to provide just punishment for the offense;
> >
> > (B)     to afford adequate deterrence to criminal conduct;

---

[3]     See October 20, 2011 Order and Reasons (Rec. Doc. 593).

(C)        to protect the public from further crimes of the defendant; and

(D)        to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)        the kinds of sentences available;

(4)        the kinds of sentence and the sentencing range established for –

(A)        the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i)        issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii)        that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B)        in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5)        any pertinent policy statement –

(A)        issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

and

        (B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

     (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

     (7)    the need to provide restitute to any victims of the offense.

Recent Supreme Court decisions following *Booker*[4] and *Fanfan*[5] instruct that district courts enjoy broad discretion now that the sentencing guidelines are merely advisory. See *United States v. Gall,* 552 U.S. 38 (2007); *United States v. Duarte,* 569 F.3d. 528 (5th Cir. 2009).[6]

---

[4]    *U.S. v. Booker,* 125 S.Ct. 738 (2005).

[5]    *U.S. v. Fanfan,* 125 S.Ct. 738 (2005).

[6]    The government, in its sentencing memorandum, urges the Court to "send a message" and believes the following sentences are appropriate:

For Defendant Bowen, a sentence of 65 years:  360 months for the non-firearm counts for which he was convicted, plus 35 years for the two firearm counts under § 924(c);

For Defendant Gisevius, a sentence of 62.4 years:  329 months for the non-firearm counts for which he was convicted, plus 35 years for the two firearm counts under § 924(c);

For Defendant Faulcon, a sentence of 87 years, based upon a total of 324 months for the non-firearm counts for which he was convicted, plus 60 years for the three firearm counts under § 924(c);

For Defendant Villavaso, a sentence of 59.3 years, which the government calculates based upon a sentence of 292 months for the non-firearm counts for which he was convicted, plus 35 years for the two firearm counts under § 924(c); and

For Defendant Kaufman, a sentence of 20 years, or 240 months, which exceeds the guidelines considerably and constitutes a request by the government that this Court depart upward or vary from the guidelines.

The federal system does not provide the possibility of parole but instead provides a modest "good behavior" credit of approximately 15% of the sentence.  Assuming good behavior, the government's calculations would mean Mr. Bowen could only be released from prison when he is 94 years 3 months old;

## I.    COUNTS 2, 7 AND 9 (THE § 924(C) FIREARM COUNTS):

Two months after the verdict was rendered in this case, the United States Sentencing Commission filed its formal report to Congress entitled "Mandatory Minimum Penalties in the Federal Criminal Justice System" (the "Report"). This Report from the U.S. Sentencing Commission, filed in October 2011, spans over 340 pages, not counting the 89 pages of figures and statistical analysis attached in support of the Commission's findings. The Report discusses the impact of mandatory minimum penalties on federal sentencing, analyzing in detail sentencing data from across the country and encompassing scholarly literature in support of the information contained in the report. The Report also makes recommendations to Congress concerning modification or enactment of statutes relating to sentencing, penal and correctional matters that the Commission found to be necessary and advisable to carry out an effective, humane, and rational sentencing policy. The Report is now public record, and can be accessed on the United States

---

Mr. Gisevius would be 93 years old; Mr. Faulcon would be 123 years old; Mr. Villavaso would be 85 years 4 months old; and Mr. Kaufman would be 73 years old upon the release of each.

       In its sentencing memorandum, the government describes the crimes committed by the defendants as involving "unspeakable violence ... (which) wrought unimaginable pain", "a betrayal of the community", "awful", "egregious", "grievous", "offensive", "callous", "outrageous" ... and ask that this Court's sentencing exercise consist of "sending a message." Though the Court would agree with the adjectives the government uses, and might even add "grim" and "shocking" to that list, sentencing in this case is no longer, and cannot be, about "sending a message", because the government's plea bargaining in this case has already severely undercut any message that could possibly be sent, and such extraordinary leniency in those plea bargains (with very low statutory maximums) guts the terminology the government now seeks to use in describing these crimes. Moreover, the government's proposed very lengthy sentences seem designed to punish these defendants who had the temerity to exercise their constitutional right to go to trial and have the government prove this case. While defendants who take responsibility and enter guilty pleas are surely entitled to a benefit under the law (which the Court encourages to a reasonable extent), defendants are never punished for exercising their constitutional right to a trial by a jury of their peers, and the government may not seek retribution against those who do so.

Sentencing Commission's website at www.ussc.gov. Neither the government nor the defendants have referenced this document, but it is very important and provides great insight to these sentences. To attribute properly, the Report is quoted/copied verbatim at length (including most footnotes) over several passages hereinafter.

    1.    *Mandatory Minimum Penalties for Firearms Offenses*

With respect to firearms offenses, in 1984 Congress amended 18 U.S.C. § 924 to provide a mandatory penalty of five years of imprisonment for using or carrying a firearm during a "crime of violence," and elsewhere established mandatory sentencing enhancements for possessing dangerous ammunition *during drug and violent crimes*. Two years later, in 1986, Congress expanded the scope of section 924(c) to include carrying or using a firearm *during a drug trafficking crime*. Congress also substantially expanded the armed career criminal provision at section 924(e), and its mandatory minimum penalty of 15 years of imprisonment, to cover firearms possession offenses committed by those with three convictions for crimes broadly defined as *"violent felonies"* and *"serious drug offenses."*

In 1998, Congress again amended 18 U.S.C. § 924(c) in three ways, primarily in response to the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995), in which the Court interpreted the prior version of section 924(c) to require the defendant's "active employment" of a firearm in the predicate offense. First, prior law had established a mandatory minimum penalty of five years of imprisonment for an offender who "use[d] or carrie[d]" a firearm during and in relation to a crime of violence or drug trafficking crime. Congress amended the statute also to require a mandatory minimum penalty of five years of imprisonment if the offender "possesses a firearm" "in

8

furtherance of any such crime."  Second, Congress established more severe mandatory minimum penalties for certain offenders depending on whether, in violating section 924(c), a firearm was "brandished" or "discharged"— requiring mandatory minimum penalties of seven years and 10 years of imprisonment, respectively.  Finally, Congress increased the mandatory minimum penalty for second or subsequent convictions under section 924(c) from 20 years to 25 years of imprisonment. Thus, in addition to responding to the decision in *Bailey*, Congress also amended section 924(c) to ensure that more serious offenses carried progressively higher mandatory minimum penalties.

It is interesting to note that in October 1993, Congress considered and enacted a statutory "safety valve" which would have permitted offenders facing mandatory minimum sentences for certain *drug* offenses to avoid the mandatory minimum sentences.  As the law stands now, certain drug offenders facing mandatory minimum sentences and having only one criminal history point (it is noted that each of the defendants herein has only one point) are eligible to receive sentences below the statutory mandatory minimum regardless of whether the drug offense defendant had previously been incarcerated, i.e., they are eligible for the "safety valve" as codified in 18 U.S.C. § 3553(f).  The defendants herein are not eligible for safety valve consideration, however, as their offenses are not drug-related.  Thus, strangely enough (and as unjust as this warp in the law seems), the law installs mandatory minimum sentences for law enforcement officers[7] under the circumstances of this case, but routinely allows for *less* than the so-called statutory "minimum" for certain drug offenses.

---

[7] Most law enforcement officers are required to carry firearms as part of their regular equipment while on duty, and use them if warranted.

In Chapter 5 of the U.S. Sentencing Commission's Report to Congress, policy views about mandatory minimum penalties are also discussed. The very first policy – very important in this case – which supposedly supports the imposition of mandatory minimum penalties is "the promotion of uniformity in sentencing and avoidance of unwanted disparity", found on Page 85 of the Commission's Report to Congress. The Report states (footnotes omitted):

> "Congress enacted many statutory minimum penalties, together with the then-mandatory guidelines system, as part of its effort in the 1980s to narrow judicial sentencing discretion and curb what it viewed as unduly disparate and lenient sentences.
>
> According to some, the importance of mandatory minimum penalties in ensuring uniformity has increased after *Booker*. The Department of Justice has observed that sentencing disparities have increased under the advisory guidelines system because for "offenses for which there are no mandatory minimums, sentencing decisions have become largely unconstrained as a matter of law." According to the Department of Justice, "this has led to greater variation in sentencing," which "in turn undermines the goals of sentencing to treat like offenders alike, eliminate unwarranted disparities in sentencing, and promote deterrence through predictability in sentence." After *Booker*, some prosecutors have charged offenses carrying mandatory minimum penalties in order to narrow the sentencing court's discretion. One judge testified that, even if mandatory minimum penalties presented problems under the pre-*Booker* sentencing scheme, they now serve to ensure needed sentencing uniformity."

Conversely, the Commission's report, on Page 92, discusses "excessive severity and disproportionality."

2. *Excessive Severity and Disproportionality*

Many view current federal mandatory minimum penalties as producing sentences that are excessively harsh relative to the gravity of the offense committed, in part because "all sentences for a mandatory minimum offense must be at the floor or above regardless of the circumstances of the crime."[8] According to the Judicial Conference of the United States, mandatory minimum penalties end up sweeping broadly because

> a severe penalty that might be appropriate for the most egregious of
> offenders will likewise be required for the least culpable violator . .
> . . The ramification for this less culpable offender can be quite stark,
> as such an offender will often be serving a sentence that is greatly
> disproportionate to his or her conduct.[9]

---

[8]    Prepared Statement of Steven Saltzburg, George Washington University School of Law, to the Commission, note 490, at 5 (May 27, 2010). *See Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834,* and *H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary,* 111th Cong. 42 (2009) (statement of Chief Judge Julie E. Carnes, U.S. District Court for the Northern District of Georgia, on behalf of the Judicial Conference of the United States) (although there may be some offenses "that are so unambiguous or heinous in nature that no examination of any fact other than the commission of the crime itself" is required to determine the appropriate sentence, "[m]ost criminal conduct . . . does not lend itself to such narrow scrutiny"); Prepared Statement of James E. Felman, American Bar Association, to the Commission, note 485,  at 8 (May 27, 2010).

[9]    *See Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834,* and *H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary,* 111th Cong., note 493, at 38 (2009) (statement of Chief Judge Julie E. Carnes, U.S. District Court for the Northern District of Georgia, on behalf of the Judicial Conference of the United States) (arguing that mandatory minimum penalties also produce unfair and irrational sentences that undermine public confidence in the judicial system and waste public resources by incarcerating offenders for longer than necessary); *See*

One scholar explains that many sentences seem disproportionate to the offense because "Congress did not link the minimum [sentence] to its picture of the least serious version of an offense," but rather to "an especially serious offender, and chooses as the 'minimum' [a] sentence that it considers appropriate for him. As a result, Congress sets 'minimum' sentences that are far too severe."[10] Some critics, including the late Chief Justice William H. Rehnquist, cite Congress's political concerns as a reason why mandatory minimum statutes are excessively severe.[11]

---

Stephanos Bibas, *Plea-Bargaining Outside the Shadow of Trial*, 117 HARV. L. REV. 2464, 2485, (2004) ("In exchange for substantially assisting the investigation or prosecution of others, defendants may earn sentences far lower than the [Sentencing] Guidelines and even mandatory minima would otherwise provide."), note 478, at 2487 ("All too often . . . sentencing guidelines and statutes act as sledgehammers rather than scalpels. This is particularly true of statutory minima and maxima, which are packaged in large, discrete chunks."); *see also* The Constitution Project, Principles for Design and Reform of Sentencing Systems: A Background Report, note 477, at 36 (May 13, 2010) ("[O]nce a mandatory minimum sentence has been enacted for a crime type, repeated increases in the minimum sentence for the same crime are even more problematic than increases in statutory maximum sentences since mandatory sentences necessarily affect all defendants convicted of an offense, while increases in statutory maximum sentences need have no impact on any particular defendant.").

[10] Prepared Statement of Steven J. Schulhofer, NYU School of Law, to the Commission, note 484, at 11 (May 27, 2010). *See also* Prepared Statement of Julie Stewart, President, Families Against Mandatory Minimums, to the Commission, at 1-2 (May 27, 2010); Prepared Statement of Michael S. Nachmanoff, Federal Public Defender, Eastern District of Virginia, to the Commission, note 487, at 2 (May 27, 2010) (concluding that mandatory minimum statutes require excessive sentences for "tens of thousands of less serious offenders who are not dangerous"); Testimony of C. Warren Maxwell, Deputy Chief U.S. Probation Officer, District of Connecticut, to the Commission, at 187 (July 9, 2009) ("Sentencing length in mandatory minimums seems to have been chosen arbitrarily without much regard to research in what is most effective in deterring crime and reducing recidivism.").

[11] *See* William H. Rehnquist, Chief Justice of the United States, *Luncheon Address* (June 18, 1993), in Commission, *Proceedings of the Inaugural Symposium on Crime and Punishment in the United States* 287 (1993) ("Mandatory minimums . . . are frequently the result of floor amendments to demonstrate emphatically that legislators want to 'get tough on crime.'"). S*ee also* Erik Luna & Paul G. Cassell*, Mandatory Minimalism*, 32 CARDOZO L. REV. 1, 24 (2010) ("[F]ederal lawmakers have explicitly used phrases like 'tough on crime' in their support for mandatory minimums, with some of the most notorious sentencing laws originating from symbolic politics."); Testimony of Chief Judge Vaughn R. Walker, U.S. District Court for the Northern District of California, to the Commission, at 43 (May 28, 2009) ("The minimum mandatories in drug cases, child pornography cases, and so forth were enacted in reaction to a perceived political need at the time. Over time . . . the political need diminishes."); *see* Stanley Sporkin & Asa

Some scholars further argue that mandatory minimum penalties produce disproportionately high sentences even for offenders not subject to such penalties "because all [federal offenders] are subject to guidelines that have been set to incorporate the mandatory minimums."[12] These observers believe increasingly severe mandatory minimum penalties have "impelled the [Commission] to increase many sentences to maintain some consistency in the Guidelines" and have caused higher sentences "virtually across the board."[13]

The Department of Justice itself has stated that "there are real and significant excesses in terms of the imprisonment meted out for some offenders under existing mandatory sentencing laws, especially for some non-violent offenders."[14] The Department of Justice explained that "[m]andatory minimum sentencing statutes in the federal system now apply to a significant array of serious

---

Hutchinson, Debate, *Mandatory Minimums in Drug Sentencing: A Valuable Weapon in the War on Drugs or a Handcuff on Judicial Discretion?*, 36 AM. CRIM. L. REV. 1279, 1295 (1999) (statement of Rep. Hutchinson) ("[Y]ou have to have a sentencing pattern that has uniformity across it, that sends the right signals . . . ."), note 460, at 1286 (statement of Judge Sporkin) ("Mandatory minimum sentencing was clearly an effort to be tough on crime. Congress was frustrated. They wanted to get rid of the drug scourge and Congress thought that putting violators of the drug laws in jail for long terms would cure the problem.").

[12]     Barbara S. Vincent & Paul J. Hofer, Federal Judicial Center, *The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings* 3 (1994).

[13]     Felman, *supra* note 485, at 9.

[14]     Prepared Statement of Sally Quillian Yates, U.S. Attorney, Northern District of Georgia, to the Commission, note 459, at 6-7 (May 27, 2010) (on behalf of the U.S. Department of Justice). In the Sentencing Project's *Downscaling Prisons: Lessons from Four States* (2010), Judith Greene and Marc Mauer recount the rise in the prison populations of New York, Michigan, and New Jersey resulting in part from the institution of mandatory minimum penalties for drug offenses, including low-level offenders. For example, in 1973, New York Governor Nelson Rockefeller supported legislation imposing a fifteen year mandatory minimum penalty for the sale of two ounces or possession of four ounces of a narcotic drug. Enactment of the "Rockefeller Drug Laws" increased the proportion of drug offenders in the state's prison population from 11% to 34%. *Id*. at 6. The report also recounts recent sentencing reforms, including the reduction or elimination of mandatory minimum penalties, in New York, Michigan, New Jersey, and Kansas, that reduced those states' prison expenditures. *Id*. at 60.

crimes; and they also, by and large, mandate very severe imprisonment terms."[15]  This, in turn, has produced exponential growth in the federal prison population since the 1980s, and the federal Bureau of Prison's overcapacity "has real and detrimental consequences for the safety of prisoners and guards, effective prisoner reentry, and ultimately, public safety."[16]  For this reason, the Department of Justice has suggested and continues to suggest "some reforms of existing mandatory minimum sentencing statutes are needed . . . to eliminate excess severity in current statutory sentencing laws and to help address the unsustainable growth in the federal prison population."[17]

The Report also advises Congress that statutory mandatory minimum sentences prevent courts from imposing individualized sentences.  As outlined on Page 95 of the Sentencing Commission's Report, mandatory minimum penalties conflict with the goal of individualized sentencing.

### 3.  *Lack of Individualized Sentencing*

For instance, the Judicial Conference of the United States has long urged Congress "to reconsider the wisdom" of mandatory minimum penalties because they "block judges from

---

[15]     Yates, *supra* note 459, at 6.

[16]     *Id.* at 7; *see* Pew Center on the States, *One in 100: Behind Bars in America* 5, 11 (Feb. 2008) ("With 1,596,127 in state or federal prison custody, and another 723,131 in local jails, the total adult inmate count at the beginning of 2008 stood at 2,319,258. With the number of adults [in the United States] just shy of 230 million, the actual incarceration rate is 1 in every 99.1 adults."); Sporkin & Hutchinson, *supra* note 460, at 1286 (statement of Judge Sporkin) ("[I]t's a terrible thing that we're doing with mandatory minimums. . . . [W]e're putting more people in prisons, we're building more prisons, it's costing us tremendous amounts of money.")

[17]     Yates, *supra* note 459, at 8, 9-10.

considering the individual circumstances of particular cases." Because mandatory minimum penalties may prevent a judge from considering all (or even most) of the pertinent facts and circumstances of the case (such as offender characteristics), the resulting sentence may be unfair or irrational. Likewise, the American Bar Association has also called for the repeal of federal mandatory minimum penalties after concluding that they are "inconsistent with the notion of individualized sentencing within a guided discretion regime." Moreover, there is significant agreement with the Judicial Conference and the ABA among judges, lawmakers, practitioners, scholars, and various advocacy groups ... and even journalists: On April 3, 2012 (the day before the sentencing hearing), a New Orleans Times Picayune columnist wrote an opinion article entitled "Put Sentencing Back in Judges' Hands", in which he criticized mandatory statutory minimum criminal sentences. He quite correctly stated:

> There used to be a time – in our country and in our state – when we looked to judges to make good decisions regarding sentences. But so much of their discretion has been taken away. There are laws that impose minimum sentences. And there are multiple-offender statutes that effectively tilt all the sentencing power to prosecutors. That's not where sentencing power belongs. Prosecutors are going to be as tough as they can get away with. Somebody ought to be able to check those tough-guy impulses.

Perhaps of greatest concern, and as well-illustrated in this case on several fronts, the Sentencing Commission criticized statutory mandatory minimum sentences because they transfer sentencing discretion from judges to prosecutors. This transfer of discretion is of concern because it both constrains judges' discretion and "shift[s] that discretion to prosecutors, who do not have the

incentive, training, or even the appropriate information to properly consider a defendant's mitigating circumstances at the initial charging stage of a case"[18] – as illustrated *infra*.

According to a report of the Constitution Project Sentencing Initiative, co-chaired by former Attorney General Edwin Meese III and Professor Philip B. Heymann, this transfer of sentencing discretion through prosecutorial under-charging and plea bargaining effectively undercuts the objective of reducing disparity.[19] Others have strongly concurred with this view: "Mandatory minimums effectively transfer sentencing authority from trial judges to federal prosecutors, who may pre-set punishment through creative investigative and charging practices, producing troubling punishment differentials among offenders with similar culpability."[20] This shift in discretion is

---

[18]     Felman, *supra* note 485, at 12-13; *see also* Testimony of Judge Gerald Bard Tjoflat, U.S. Court of Appeals for the Eleventh Circuit, to the Commission, at 29 (Feb. 10, 2009) ("One of the problems with mandatory minimums is the prosecutor becomes the sentencer in many cases."); Testimony of Judge Jay C. Zainey, U.S. District Court for the Eastern District of Louisiana, to the Commission, at 29-30 (Nov. 19, 2009) ("[I]t should not be the ultimate responsibility or power of the government to let, to allow us or to enable us to go below the statutory minimum."); Sporkin & Hutchinson, *supra* note 460, at 1286 (statement of Judge Sporkin) ("And yet we're giving that twentyfive or thirty-year-old [Assistant United States Attorney] more discretion than you're giving a fifty-five-year-old judge who's had a lot of jobs and has been through the system and thoroughly vetted."); *Mandatory Minimum Sentences – Are They Being Imposed and Who is Receiving Them?: Hearing Before the Subcomm. on Crime and Criminal Justice of the H. Comm. on the Judiciary*, 103rd Cong. 4 (1993) (statement of Henry R. Wray, Director of Administration of Justice Issues, U.S. Government Accounting Office) ("[The General Accounting Office identified] several [Department of Justice] district charging policies and practices that influenced decisions whether to pursue mandatory minimum convictions against certain categories of defendants."); Paul Hofer, *Federal Sentencing for Violent and Drug Trafficking Crimes Involving Firearms: Recent Changes and Prospects for Improvement*, 37 AM. CRIM. L. REV. 41, 58 (2000) ("It seems likely that use of [firearm sentencing enhancements] as bargaining chips is a major reason for circumvention [of the specified mandatory minimum penalty]."); Judge Cassell, *supra* note 510, at 152; Nachmanoff, *supra* note 487, at 12.

[19]     The Constitution Project, *supra* note 477, at 27 ("[T]he existence of mandatory minimum sentences tied to conviction of particular offenses permits manipulation of sentences through differential prosecutorial charging and plea bargaining policies . . . [that] undercuts the objective of reducing disparity.").

[20]     See Prepared Statement of Erik Luna, Cato Institute, to the Commission, note 489, at 4 (May 27, 2010); *see also id*. at 4-5 (noting that "Prosecutors are influenced by ordinary human motivations that may

16

especially problematic, according to some, because prosecutorial decisions are made outside of public view and in an "uncertain and inconsistent" manner.[21] U.S. Supreme Court Justice Anthony Kennedy has observed that even though a prosecutor may act in good faith, the "trial judge is the one actor in the system most experienced with exercising discretion in a transparent, open, and reasoned way."[22] In the Commission's 2010 survey of federal judges, 66 percent of respondents ranked charging decisions among the top three factors contributing to sentencing disparities.

Moreover, and of even more gravity, the United States Sentencing Commission states that it is clear that mandatory minimum penalties can also be used to coerce defendants to plead guilty and waive constitutional rights: "Under this system, defendants who choose not to capitulate and go to trial are ultimately sentenced not only for their misconduct, but for declining to plead guilty on the prosecutor's terms."[23] Finally, according to the U.S. Sentencing Commission, the threat of

---

at times cause a loss of perspective . . . [potentially] leading to the misapplication of mandatory minimums. . . . A sentencing judge is the one neutral actor in the courtroom who benefits from neither harsh punishment nor lenient treatment.").

[21] Felman, *supra* note 485, at 11-12; *see also Mandatory Minimum Sentences – Are They Being Imposed and Who is Receiving Them?*, *supra* note 517 ("Prosecutors consider many factors in making charging decisions. On the basis of the information in the case files, [the General Accounting Office was] unable to determine for individual cases why a mandatory minimum charge was dropped, reduced, or never brought."); *National Assessment of Structured Sentencing*, *supra* note 485, at 100 ("By radically constricting judicial discretion, mandatory minimum penalties severely constrain the sentencing process and move the locus of disparity to the charging stage, where it is less visible.").

[22] Justice Anthony M. Kennedy, U.S. Supreme Court, Speech at the American Bar Association Annual Meeting (Aug. 9, 2003), *available at* http://www.supremecourt.gov/publicinfo/speeches/viewspeeches.aspx? Filename=sp_08-09-03.html.

[23] Nachmanoff, *supra* note 487, at 12; *see* Rorty, *supra* note 483, at 2 ("Then prosecutors used that threat [of mandatory minimum penalties] to force defendants to bargain away their constitutional rights to request bail, remain silent, move to suppress illegally acquired evidence, discover the evidence against them, and receive a trial by jury – all as the price for not being exposed to the higher minimum."); Luna, *supra* note 489, at 2 (suggesting such practices impose a "trial tax" on defendants who exercise their

17

mandatory minimum penalties might cause offenders to give false information, to plead guilty to charges of which they may actually be innocent,[24] or to forfeit a strong defense.[25] *See* Nachmanoff, *supra* note 487, at 13 ("The problem with mandatory minimums is that they have a coercive effect. . . . This extraordinary pressure can result in false cooperation and guilty pleas by innocent people."); Ellen Yaroshefsky, *Cooperation with Federal Prosecutors: Experiences of Truth Telling and Embellishment*, 68 FORDHAM L. REV. 917, 931 (1999) ("[F]ormer [Assistant United States Attorneys] . . . readily admit that, in some instances, they simply could not determine if the cooperator had told the truth."); Prepared Statement of Thomas W. Hillier, II, Constitution Project, to the Commission, at 6-7 (May 27, 2010) (explaining that mandatory minimum penalties "create a powerful incentive for informants and cooperators to provide exaggerated or false information [to prosecutors] . . . [that] is not subjected to the crucible of trial").

Chapter 9 of the Sentencing Commission's Report to Congress is dedicated entirely to mandatory minimum penalties for firearm offenses, in particular 18 U.S.C. § 924(c), which is relevant in this case, and 18 U.S.C. § 924(e) which is not. On Page 359 of the Sentencing Commission's Report to Congress in October 2011, the Sentencing Commission was highly critical

---

constitutional right to a jury trial).

[24]    Nachmanoff, *supra* note 487, at 13.

[25]    Prepared Statement of Cynthia Hujar Orr, National Association of Criminal Defense Lawyers, to the Commission, at 8 (May 27, 2010) ("The risk of being sentenced under mandatory minimums effectively precludes defendants from exercising their Sixth Amendment right to a trial. . . . [E]ven if a defendant has minimal culpability or a strong defense, faced with a mandatory minimum sentence of ten years or more, a defendant will almost always forego his right to a trial.").

of what has become known as "stacking" mandatory minimum penalties under § 924(c).  *See Deal v. United States*, 508 U.S. 129 (1993).  Quoting from the Commission's Report:

> <u>"Stacking" mandatory minimum penalties under section 924(c)</u>
>
> Unlike other statutes and sentencing enhancements that apply based on an offender's prior convictions, section 924(c) requires the "stacking" of its mandatory minimum penalties based on multiple offenses charged in the same indictment. Thus, an offender convicted of an underlying offense and two counts of an offense under section 924(c) will receive consecutive mandatory minimum penalties of at least 5 years[26] and 25 years of imprisonment, in addition to any term of imprisonment imposed for the underlying offense and other counts of conviction.  An offender charged with three counts of an offense under section 924(c) will face another consecutive 25-year mandatory minimum penalty. Such a result may occur even if the offender has no prior record.

According to the Sentencing Commission,

> The "stacking" of mandatory minimum penalties for multiple violations of section 924(c) results in excessively severe and unjust sentences in some cases.  The sentences for offenders convicted of multiple counts of an offense under section 924(c) were the highest average sentences for any offenders convicted of an offense carrying a mandatory minimum penalty in fiscal year 2010.

---

[26]     It is 10 years in this case.

The Commission's Report explains further in a footnote:

> The case of Weldon Angelos illustrates the unduly severe sentences that stacking mandatory minimum penalties under section 924(c) produces. The Judicial Conference of the United States has twice cited Angelos's case in opposition to stacking section 924(c) penalties in its testimony before Congress, and has similarly cited the case in testimony before the Commission. Angelos was a 24-year-old first-time offender convicted of three counts of an offense under section 924(c), among other offenses, in the District of Utah. His offense conduct was not extraordinary among drug offenses; he was the target of "controlled buys" in which a governmental informant purchased eight ounces of marijuana from Angelos on three occasions. On two of those occasions, Angelos was known to have possessed a firearm. A subsequent search of Angelos's residence revealed three pounds of marijuana and three additional firearms. Angelos's three convictions of an offense under section 924(c) were based on the two transactions at which he possessed a firearm, and the additional firearms found at his residence. The district court sentenced Angelos to the mandatory minimum penalty of 55 years of imprisonment for violating section 924(c) (five years for the first section 924(c) offense and consecutive terms of 25 years of imprisonment for the second and third offenses), in addition to a concurrent one-day term of imprisonment imposed for the underlying and other offenses [other thirteen (13) drug distribution offenses]. Assuming Angelos receives good-time reductions, he can expect to be eligible for release from prison when he is 78 years

old.  The sentencing judge concluded that this sentence, though constitutional and required by the statute, was "unjust, cruel, and even irrational," and he further noted that had Angelos been sentenced under the guidelines, his guideline range would have been 97 to 121 months, still a substantial sentence. *See United States v. Angelos,* 345 F. Supp. 2d 1227, 1230-31, 1241 (D. Utah 2004), *aff'd,* 433 F.3d 738 (10th Cir. 2006).

U. S. District Judge Paul Cassell, who presided over the *Angelos* case, put together two interesting tables with regard to comparative sentences of other egregious crimes.  In the first, he compared a single instance of a crime committed, and stated the comparative length of prison term under the guideline calculations:  **See Judge Cassell's Table I, attached.**  In the second table, he compared the calculated prison terms for each of those crimes had it been committed three times by the same individual: **See Judge Cassell's Table II, attached.**

The Tenth Circuit affirmed the sentences given, but explained:

> The Supreme Court has noted that the "basic purpose" of § 924(c) is "to combat the 'dangerous combination' of 'drugs and guns.'" *Muscarello v. United States,* 524 U.S. 125, 126, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (quoting *Smith v. United States,* 508 U.S. 223, 240, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)).  The Court has also noted that "the provision's chief legislative sponsor ... said that the provision seeks 'to persuade the man who is tempted to commit a Federal felony to leave his gun at home.'" *Id.*  (quoting 114 Cong. Rec. 22231 (1968) (Rep.Poff)).  In addition, the Court has concluded that it was entirely rational for Congress to penalize the mere presence of a firearm during a drug transaction: "Whether guns are used as the medium of exchange for drugs sold illegally or as a means to protect the transaction or dealers, their introduction into the scene of drug transactions dramatically heightens the danger to society." *Smith,* 508 U.S. at 239, 113 S.Ct. 2050 (internal quotation marks

omitted).  In this same vein, the Third Circuit has held that "[i]t is likely that Congress," in enacting § 924(c), "meant ... to protect our communities from violent criminals who repeatedly demonstrate a willingness to employ deadly weapons by punishing them more harshly."  *United States v. Couch,* 291 F.3d 251, 255 (3d Cir. 2002).  In sum, the lengthy sentences mandated by § 924(c) were intended by Congress to (a) protect society by incapacitating those criminals who demonstrate a willingness to repeatedly engage in serious felonies while in possession of firearms, and (b) to deter criminals from possessing firearms during the course of certain felonies.  Notably, both of these penological theories have been held by the Supreme Court to be valid and subject to deference by the courts.  *See Ewing,* 538 U.S. at 24-28, 123 S.Ct. 1179; *Harmelin,* 501 U.S. at 998-99, 111 S.Ct. 2680.

*United States v. Angelos,* 433 F.3d 738, 751 (10th Cir. 2006).  In concluding that the Angelos sentence was not disproportionate, the Tenth Circuit specifically cited "Congress' decision to severely punish criminals who repeatedly possess firearms in connection with drug trafficking crimes ..."  Interestingly enough, the Tenth Circuit's opinion does not reflect any appeal by the government of Judge Cassell's one day concurrent sentence on the thirteen (13) other counts, which would imply the government's satisfaction that the 55-year sentence – plus one day – was an acceptably long sentence.  Continuing from the Sentencing Commission's Report:

While only 147 cases sentenced in fiscal year 2010 involved multiple violations of section 924(c), many agree that Congress should address the excessively severe sentences that stacking produces in some cases. The Commission conducted hearings on mandatory minimum sentencing, at which witnesses from a variety of perspectives — including judges,[27] prosecutors[28] and defense counsel[29]

---

[27]    *See* Testimony of Chief Judge Robert J. Conrad, Jr., U.S. District Court for the Western District of North Carolina, to the Commission, at 130 (Feb. 11, 2009) ("Mandatory minimums have the most

— identified the stacking of penalties under section 924(c) as potentially producing unjustly severe sentences. In district interviews with Commission staff, many representatives of the FPD and CJA panels, and some prosecutors, stated that the mandatory minimum penalties for committing multiple violations of section 924(c) are particularly harsh.[30]

The Judicial Conference of the United States has historically opposed mandatory minimum penalties, but it has rarely articulated a policy position with respect to particular mandatory minimum sentencing provisions. Evidencing the

potential for disproportionate sentencing in the stacking of Title 18 U.S.C. Section 924(c) charges."); *see also Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 60–61 (2009) (statement of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States) (identifying the stacking of penalties under section 924(c) as among the "most egregious mandatory minimum provisions that produce the unfairest, harshest, and most irrational results"); *Mandatory Minimum Sentencing Laws – The Issues: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 110th Cong. 43–101 (2007) (testimony and statement of Judge Paul G. Cassell on behalf of the Judicial Conference of the United States) (criticizing the lengthy sentences produced by stacking section 924(c) penalties).

[28]     *See* Testimony of Sally Quillian Yates, U.S. Attorney, Northern District of Georgia, to the Commission, at 59–60 (May 27, 2010) (explaining her personal view that "there are criticisms and concerns about the stacking of 924(c)[ penalties], particularly in a scenario where you have an individual who is charged with multiple 924(c) counts in the same indictment. And so consequently, while the purpose of 924(c) may have originally been as a recidivist statute, where you have an individual who goes out on a spree and robs three banks is now looking at life as a result of that, . . . that might not necessarily be the most appropriate use of the sentencing structure.").

[29]     *See* Prepared Statement of Michael S. Nachmanoff, Federal Public Defender for the Eastern District of Virginia, to the Commission, at 25–26, 29 (May 27, 2010) (explaining that "[t]he flat mandatory minimum statutory enhancements for possession or use of a firearm under 18 U.S.C. § 924(c) are among the worst sources of disparity," that the "[s]tacking of § 924(c) counts result in the most egregiously severe sentences," and that the stacking of penalties under section 924(c) "has led to extreme abuses").

[30]     *See supra* Chapter 6(C) and (D)(2).

strength of its opposition to the stacking of mandatory minimum penalties under section 924(c), the Judicial Conference has urged Congress on at least two occasions to amend the "draconian" penalties established at section 924(c) by making it a "true recidivist statute, if not rescinding it all together."[31] The Judicial Conference has supported its position by observing that the sentences resulting from stacking section 924(c) mandatory minimum penalties are "greater by many years" than the guideline sentences for offenders who commit the most serious, violent crimes.[32]

The Department of Justice itself has issued policies that allow prosecutors to refrain from charging multiple section 924(c) counts because of the particularly long sentences that stacking can produce. In September 2003, for example, then-Attorney General John Ashcroft instructed federal prosecutors to "charge and pursue the most serious, readily provable offense or offenses *that are supported by the facts of the case.*" [italics added] The memorandum defined the "most serious" offense as the count "that generate[s] the most substantial sentence under the Sentencing Guidelines, *unless* a mandatory minimum sentence or count requiring a consecutive sentence would generate a longer sentence."[33] The memorandum instructed

---

[31] *See Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 35 (2009) (testimony of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States).

[32] *See id.*

[33] *See* Memorandum from John Ashcroft, Attorney General, to all Federal Prosecutors dated September 22, 2003, regarding Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing, *available at* http://www.justice.gov/opa/pr/2003/September/03_ag_516.htm.

prosecutors to charge the first readily provable violation of section 924(c), but it permitted prosecutors not to charge a second violation of section 924(c). The memorandum recognized that multiple violations of section 924(c) "[i]n many cases . . . will mean that the statutory sentence exceeds the applicable Sentencing Guidelines range, thereby ensuring that the defendant will not receive any credit for acceptance of responsibility and will have no incentive to plead guilty.[34] Similarly, recent policies implemented by current Attorney General Eric Holder instruct prosecutors to continue to charge the most serious offense but to do so in accordance with an "individualized assessment" of the offender and the circumstances of the particular case. *See* Memorandum from Eric H. Holder, Jr., Attorney General, to all Federal Prosecutors dated May 19, 2010, regarding Department Policy on Charging and Sentencing, *available at* http://www.justice.gov/oip/holder-memocharging-sentencing.pdf.

As to the cooperating defendants in Danziger, this DOJ policy was not followed – they were <u>not</u> charged with the most serious offense supported by the facts of this case, but were forgiven for it; as to the defendants sentenced today, this DOJ policy was abused through "stacking", resulting in mandatory statutory sentences that exceed applicable Sentencing Guideline ranges.

Lastly, the U.S. Sentencing Commission recommended that Congress amend the length of § 924(c) penalties so that the enhanced mandatory minimum penalties for a second or subsequent offense apply only to prior *convictions*, and should consider amending the penalties for such

---

[34]     *See id.*

25

offenses to lesser terms; that Congress should eliminate the stacking requirement and amend 18 U.S.C. § 924(c) to give the sentencing court discretion to impose sentences for multiple violations of § 924(c) concurrently with each other, and that Congress consider clarifying the statutory definitions of the underlying and predicate offenses that trigger mandatory penalties under § 924(c) and the Armed Career Criminal Act to reduce the risk of inconsistent application and litigation that those definitions have fostered.

Because the Court is statutorily required to impose mandatory sentences consecutive to and without regard to the other sentences imposed on the other counts, it will follow the Congressionally-mandated mechanical process of sentencing as to Counts 2, 7 and 9 (Firearm Counts): The Court is duty-bound to sentence four of these defendants to statutory minimums, and will do so. The Court recognizes the potential Constitutional infirmity of these sentences on any number of grounds, including but not limited to due process, equal protection, double jeopardy, and under the Eighth Amendment; however, the Court likewise recognizes the Fifth Circuit's opinion in *United States v. Ramos,* 537 F.3d 439 (5th Cir. 2008), cert. denied, 129 S.Ct. 1615 (2009). In so doing, the Court again notes with alarm that others committed the same acts and will not be held fully responsible for them. In a case full of things that shock the conscience, this is yet another. Therefore, sentences on these counts are non-discretionary and are statutorily mandated by Congress: For Count 2, defendants Kenneth Bowen, Robert Gisevius, Robert Faulcon and Anthony Villavaso are each sentenced to 10 years in prison, served consecutive to any other sentence imposed; for Count 7, defendants Kenneth Bowen, Robert Gisevius, Robert Faulcon and Anthony Villavaso are each sentenced to 25 years in prison, consecutive to the sentence for Count 2 and any

26

other sentence imposed; and as to Count 9, defendant Robert Faulcon is sentenced to yet another 25 years in prison, consecutive to the first two sentences of 10 years and 25 years, and consecutive to any other term of imprisonment imposed. These sentences serve none of the salutary purposes of § 3553(a); the Court imposes them purely as a matter of statutory mandate.

## II.     THE REMAINING COUNTS:

Putting aside the § 924(c) firearm counts, and without regard to them, the Court now turns to the issue of sentencing on the other counts, wherein the Court is afforded some discretion after consulting the advisory guideline ranges. *United States v. Gall,* 552 S.Ct. 38 (2007); *United States v. Brantley,* 537 F.3d 347 (5th Cir. 2008); and *United States v. Duarte,* 569 F.3d 528 (5th Cir. 2009). The Court is also well cognizant of the following opinions cited by the government, none of which are Fifth Circuit controlling opinions, but have been read by the Court for their persuasive authority: *United States v. Worman,* 622 F.3d 969 (8th Cir. 2010); *United States v. Williams,* 599 F.3d 831 (8th Cir. 2010); *United States v. Roberson,* 474 F.3d. 432 (7th Cir. 2007); *and United States v. Chavez,* 549 F.3d 119 (2d Cir. 2008). None of the parties including the government have cited to a Fifth Circuit opinion that follows *Worman, Williams, Roberson* and *Chavez*, nor has the Court found any opinion wherein the Fifth Circuit has adopted the positions set forth by the Second, Seventh and Eighth Circuits in those opinions.

Against this background, the Court returns to the factors set forth in Section 3553(a), which the Court must consider and apply in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the particular defendant; (2) the need for the sentence imposed, including the provision of just punishment, adequate deterrence, and protection of the

27

public; (3) kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) consideration of any pertinent policy statements issued by the Sentencing Commission, of which I have already spent an exhaustive amount of time discussing; (6) perhaps the most critical factor here, the need to avoid unwarranted sentence disparities among defendants with similar records who are guilty of similar conduct; and (7) the need to provide restitute.

**(1)     the nature and circumstances of the offense and the history and characteristics of the defendant**

**a.     the offense:**

The Court has already commented on how serious and egregious these crimes are, and how they impact not only the victims in a tragic fashion involving great bodily harm, and death, but also how deep a wound these offenses inflict on our citizenry.

**b.     history and characteristics of the defendants:**

**1.     Kenneth Bowen:**

Defendant Kenneth Bowen is a native New Orleanian and lifelong resident of Orleans Parish. Bowen graduated from O. Perry Walker High School and served in the United States Marine Corps Reserves. He joined the New Orleans Police Department in 1997, working full time while completing college at Loyola and also attending law school at Loyola where he was eligible for law review. In 2003, he was promoted to sergeant in the NOPD and in 2004, he graduated from Loyola Law School. During his years in the NOPD, Bowen, or the units in which he worked, received several commendations. From 2008 to 2010, Bowen was assigned to the Criminal Intelligence Bureau, where he performed high level security work with the United States Department of

Homeland Security, without incident. He has one son, age 5. He stands before the Court today having been convicted of Counts 1, 3-6, 11, and 19-20.[35]

### 2.   Robert Gisevius:

Defendant Robert Gisevius, Jr. is a native of New Orleans, who grew up in the Gentilly area. He attended Pope John Paul II High School in Slidell, was enlisted in the Louisiana Army National Guard Reserves from 1993 to 1996 before receiving an honorable release from active duty. In 1997, defendant Gisevius graduated from the New Orleans Police Academy and has served in NOPD until his arrest in July 2010. During that time, he was promoted to sergeant in 2004. Mr. Gisevius has two sons, ages 12 and 6. He stands before the Court today having been convicted of Counts 1, 3-6, 11, and 21.[36]

### 3.   Robert Faulcon:

Defendant Robert Faulcon, Jr. is a native of Brooklyn, New York. He was raised by his parents, both of whom were here for the duration of the trial. His father is a minister. Upon graduation from high school in North Carolina, defendant Faulcon enlisted in the United States Army, and then successfully completed airborne training, and was honorably discharged in January 1986. In November 1986, defendant Faulcon enlisted in the United States Navy, and received his honorable discharge from that branch of the service in April 1991. He served in the United States Navy Reserve as well. In 1997, he completed training at the New Orleans Police Academy in order to take a position with the Orleans Parish Criminal Sheriff's Office, and successfully obtained his

---

[35]   Not counting the aforementioned § 924(c) counts.

[36]   Not counting the aforementioned § 924(c) counts.

POST certification. From December 2001 until October 31, 2005, defendant Faulcon was employed as a police officer with the NOPD, a position from which he resigned on October 31, 2005 in order to take a job in Houston, Texas to be with his family. Defendant Faulcon has one son, born in the week or two after Katrina while Mr. Faulcon was on duty in New Orleans. In a real sense, Robert Faulcon's six year old son, Rashad, is now yet another victim of Hurricane Katrina and what has come to be known as "Danziger", as he will never see his father outside of the walls of a prison under this sentencing scheme. Robert Faulcon stands before the Court today having been convicted of Counts 1, 3-6, 8, 11 and 22.[37]

### 4. Anthony Villavaso:

Although a description of defendant Anthony Villavaso is in order, the best description of this man is contained in the letter written by his father, Anthony M. Villavaso, between the August 5th date of the conviction and the October date of the elder Mr. Villavaso's passing:

> My name is Anthony M. Villavaso. I am the father of Anthony M. "Tony" Villavaso II. He is my wife's and my only child, whom we love dearly. He was born in New Orleans, Louisiana, on October 12, 1976. Through his years of growing up, he was able to know both sets of grandparents, who assisted in molding his character and personality.

> We are a close family that spent many hours of quality time with Anthony as he was growing up. When he was a little boy, all of us would go down to Reggio to fish and crab. It was especially rewarding to see his little face when he caught a fish on his rod or raised the crab nets with crabs in them. His little eyes would light up, and you could see the happiness in his face. We as a family had great and rewarding times together, but time moves on.

> Anthony was reared in the Catholic faith, in a home where Christian morals, values and respect for others was constantly taught and emphasized. He attended

---

[37]    Not counting the aforementioned § 924(c) counts.

Catholic schools throughout his life. Anthony started elementary school at St. Raphael, then Our Lady of Lourdes. During his elementary years, at the age of 8, he decided he wanted to play music. I thought that he would want to play a simple instrument. To his mother's and my surprise, he decided to play alto-saxophone. For me, that was too many fingers to have to focus on and move at the same time. His goal was to play the saxophone and one day become a member of the St. Augustine "Marching 100" band, which he did during his freshman year under the direction of Mr. Edwin Hampton. While at St. Augustine, he played music and participated in various band functions. He did well in his grades also.

During his junior year, community service was a part of graduation requirements. Anthony did his service hours at Touro Infirmary Hospital. His duties consisted of taking patients to and from x-ray tests, delivering supplies, and performing other required tasks asked of him. He enjoyed helping people and the staff enjoyed him assisting them and their patients. His final community service report was one of excellent. The evaluator described him as a polite, well-mannered hard working young man. He always came in with a smile on his face, and was willing to perform any task asked of him.

After graduating from St. Augustine, he attended Southern University in New Orleans for 1½ years.

Anthony is the father of two loving children; a son and daughter. He has been a caring and loving father to his children. They are the love of his life, and I must say ours also. His children have suffered greatly within the last few months. He has always been dedicated to family.

Throughout his life, he has had a kind heart, generous personality and a pleasant disposition toward others. He was taught from an early age to respect others, because in order to get respect, you have to give respect. Respect is earned through your actions, and the way you present yourself.

Sir, my son Anthony M. Villavaso II is a good man. He has never been in any type of trouble as a young man growing up in today's society. My family, wife and I love him very much. We ask for your consideration. Judge Engelhardt, I would like to thank you for taking the time to read my letter about my son Anthony.

With Great Respect,
Anthony M. Villavaso

With regard to his career at the New Orleans Police Department, defendant Villavaso joined the NOPD in 2001, when he enrolled in and completed the New Orleans Police Academy, having obtained his POST certification. The Court has no evidence that Mr. Villavaso's tenure at NOPD was controversial, inadequate, or negative in any way; rather the record indicates that he has, but for the crimes here, discharged his responsibilities in appropriate fashion. He stands before the Court today having been convicted of Counts 1, 3-6, 11 and 23.[38]

### 5.    Arthur "Archie" Kaufman:

Defendant Arthur Robert Kaufman was born in Queens, New York, and has lived in Louisiana since 1978. He was enlisted in the United States Army between 1982 and 1983, and received an honorable release from active duty, whereupon he served in the National Guard and Coast Guard Reserves. From March 1990 until June 2011, defendant Kaufman was employed by the NOPD, having been promoted to sergeant in 2004. During that time, according to Special Agent- in-Charge Kelly Bryson (who testified at trial), Kaufman worked with many agents of the FBI handling violent crime matters. He was considered friendly and cooperative with the FBI agents – Agent Bryson described him as having "a very positive relationship with agents in our office." Bryson Testimony, pp. 16, 51, and 84. The Court has been provided with no evidence or other information indicating that Sergeant Kaufman's conduct, other than the instant offenses, was improper or inadequate in the discharge of his responsibilities as an NOPD officer. He has one adult daughter. He stands before the Court today having been convicted of Counts 11-18, 24 and 25.

---

[38]    Not counting the aforementioned § 924(c) counts.

### **(2) the need for the sentence imposed:**

Without a doubt, the remaining counts (not involving firearms) are serious crimes, and terms of imprisonment are warranted. The sentences that the Court imposes on these counts are based upon all relevant factors including but not limited to the backgrounds and personal histories of these defendants, which I have just outlined, as well as the need for punishment. Defendant Kaufman does not face statutory minimums, however, the sentence he receives today factors in what would be considered adequate punishment relative to the seriousness of his crimes, and how those crimes are viewed by the government when committed by others, as set forth hereafter.

### **(3) the kinds of sentences available:**

Again, the Court is, unfortunately, rather limited in terms of what sentences are available. It was the Court's hope that sentences that adequately punish these defendants through considerable incarceration, and then serve to force them to make good on their wrongdoing, could be fashioned. These four men are able-bodied and in no way handicapped; and, in terms of violating civil rights and breaching the public trust by committing crimes of obstruction, they will not have the opportunity to commit those crimes again, as they will never serve in public law enforcement again, even were they not incarcerated. Thus, rather than having them live at taxpayers' expense in a federal prison for the remainder of their lives, it strikes me as much more preferable to sentence them to lengthy but realistic prison terms, and then thereafter to put them in a position to rectify their wrongs through some type of restitute, extensive community service, or other such beneficial conduct of which they are capable. The Court is not afforded such latitude because of the sentences already given based on statutory minimum assigned to these crimes, and thus those options are foreclosed.

**(4)    the kinds of sentence and the sentencing range based on category of offense committed and criminal history category under the Sentencing Commission's guidelines:**

All five of the defendants are criminal history Category 1 under the guideline calculation as calculated pursuant to the United States Sentencing Commission Guidelines. None has a criminal history; indeed, all have received commendation for their work as police officers prior to September 4, 2005.

**(5)    any pertinent policy statement:**

As to any pertinent policy statement, the Sentencing Commission's policy can be discerned very clearly, without any equivocation whatsoever, in its October 2011 Report to Congress entitled "Mandatory Minimum Penalties in the Federal Criminal Justice System", from which this Court has already quoted extensively. The Court cited the Commission's Report as that pertinent policy statement of the United States Sentencing Commission not only for consideration under Part 5 of Section 3553(a), but also because lengthy mandatory minimums required to be served consecutively do necessarily impact all other sentences. Commission policies are not served by the mandatory minimum sentences imposed, and the consecutive sentences to be imposed in these remaining counts.

**(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct:**

As to this factor, the Court will discuss it hereinafter.

**(7)    the need to provide restitute to any victims of the offense:**

Though the Court recognizes that, pursuant to 18 U.S.C. § 3663(a), restitution shall be ordered, this is not without complication. First of all, the Court has received nothing, not a single

piece of paper or other information or documentation supporting a quantification of restitution for any victim. This sentencing has been continued twice on the docket of this Court; the actual event of the shooting took place over six and a half years ago; counsel was retained and civil lawsuits were filed a few years ago; the defendants were indicted over twenty-one months ago; and a verdict was rendered in this case eight months ago. It is truly difficult to imagine why restitution has not been quantified and submitted to the Court by the victims (or their counsel) in connection with this sentencing, although § 3664(a) requires the submission, to the extent practicable, of "a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant."[39] If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impractical, the probation officer shall so inform the court." In this case, however, the number and identity of the victims has long been well known throughout the community, and a complete accounting of the losses to each victim has certainly been fully investigated by their counsel and by the government over the past five years, and surely over the past eight months since the guilty verdicts were rendered in this case.

And there are other complications. For instance, many others participated in, and aided and abetted, the perpetration of these crimes. It is impossible to attribute or apportion restitution among these actors – both those who entered guilty pleas and those who have never been charged, but nonetheless aided and abetted – with any certainty. The testimony of the cooperating defendants

---

[39] The Pre-Sentence Reports on each defendant indicate a current inability to pay any fine, and thus any restitution.

all reflected their perpetration of each of the crimes for which a guilty verdict was rendered herein. None of the other criminal defendants who admitted, from the witness stand, that they committed these crimes have been ordered to pay restitution as part of their sentencings. Those defendants who were not part of this trial received substantial benefits of severely-reduced sentences. It makes no sense to order these defendants today to pay entire restitution, when others who every bit participated with, and aided and abetted, them have been forgiven such obligation.

Moreover, given the very long prison terms which the Court is required to impose on four of these defendants, as well as defendant Kaufman's age, any restitution would likely be impossible to pay. Were these defendants to serve long prison terms but still come out to rejoin the work force in some capacity, restitution would not be impossible; with these prison terms, restitution is practically meaningless.

Furthermore, as described at trial, the victims of these crimes have filed civil actions to recover damages. Their able counsel sat through significant portions of the trial, and they have the benefit of these proceedings to assist in their recovery in the civil lawsuits they have filed. Most importantly, several of the victims have stated publicly, both here in court and in various media outlets, that their only concern and pursuit with regard to the events of September 4, 2005, was to bring the perpetrators to justice. When asked at trial about retaining counsel, they downplayed their interest in financial compensation, and the jury accepted that testimony as given under oath. The Court does likewise.

The Court recognizes the provisions of 18 U.S.C. § 3664(d)(5) which allows the Court to grant additional time, but only "if the victim's losses are not ascertainable by the date that is ten days

prior to sentencing." No such showing has been made, or even attempted. Therefore, the Court is unable to award restitution in this case.

The Court returns to the factors under Section 3553(a)(2). The first of those is: **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense:**

There can be no underestimating the seriousness of the offenses here: two lives were lost, serious bodily injury was inflicted, and as previously discussed, official Police Department records, upon which the public has the right to rely, were corruptly impaired. Punishment is in order, and the law prohibiting such conduct must be respected by the imposition of sentences on these five defendants. The Court believes that the sentences imposed today (on these counts) provides just punishment for these offenses, considering the entirety of the sentences.

**(B) Next, whether the sentence affords adequate deterrence to future criminal conduct:**

The sentences issued today much more than serve the purpose of affording adequate deterrence to future criminal conduct with regard to these defendants. These defendants were convicted of violating civil rights under color of law, and obstructing justice. Suffice it to say none of these defendants will ever be operating under color of law, or hold a position of public trust. Thus, they will not be in a position to commit such crimes in the future. There is no doubt that police officers will serve jail terms if involved in such activity.

**(C) Thirdly, whether the sentence protects the public from further crimes of each defendant:**

The public is protected as these defendants will not be in a position to violate the civil rights of any other citizens under color of law. Likewise, these defendants will not be in a position to

falsify documents or make false statements to be put in official New Orleans Police Department documents in the future. Given their long jail terms, suffice it to say the public is protected from any possible further crimes each of the defendants Bowen, Gisevius, Villavaso or Faulcon could possibly imagine. Likewise, Kaufman's jail term, along with his term of supervised release, protects the public from any further crimes of the sort he has committed herein.

**(D) Lastly, under this subsection, the Court is required to consider whether the need for this sentence includes providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner:**

With regard to this factor, the Court has considered that certain of the defendants need medical care, and will make recommendations to the Bureau of Prisons accordingly.

The Court now returns to the considerations which the law requires this Court to give under Section 3553(a)(6): the need to avoid unwarranted sentence disparities among defendants. This is, without a doubt, the most troubling and rather unsettling aspect of these sentences. All defendants and wrongdoers involved in what has come to be known simply as "Danziger" must be considered. The Court elaborates hereafter based upon the factual circumstances all as testified to by the very people who have taken the witness stand at this trial and told what they did. When one considers the criminal conduct in this case – that committed by the defendants to be sentenced today along with those with whom they worked side-by-side, hand-in-glove, step-by-step – one can only be astonished and deeply troubled by the terms of the plea bargains allowed in the Danziger bridge matter.

### 1. Jeffrey Lehrmann

Jeffrey Lehrmann was among the first couple of involved defendants to enter a guilty plea regarding this matter. Mr. Lehrmann's involvement encompassed all of the same conduct as Mr. Kaufman with regard to the cover-up. In fact, Lehrmann worked along side Mr. Kaufman, step-by-step, with regard to the so-called "planted gun"; and Lehrmann is even attributed as the one who thought up the name of "Lekeisha" for the fabricated witness; he admits as much. His conduct is just as reprehensible as that which the jury found defendant Kaufman to have committed. Unlike Kaufman, he then appeared before the federal grand jury and admitted he then lied, yet another serious federal crime.

Yet the government offered Lehrmann the opportunity to plead guilty simply to misprision of a felony, which carries a *maximum* sentence of only three years. It remains astonishing that a man who admittedly participated in the framing of two innocent people is not only allowed to limit his prison exposure to three years, but was also allowed by the government to keep his (subsequent) job as an Immigration and Customs Enforcement Agent *after* having admitted to such deeds. Although the government maintains (and the undersigned agrees) that, as one of the first to come forward, Mr. Lehrmann should get the best deal in helping to unravel this case, surely the government was well aware that such a generous deal would create significant problems when considering sentencing disparity of others who committed the very same or similar serious crimes. In other words, while a distinction can be made for acceptance of responsibility, the disparity cannot be *so* great as to overstate the value of Lehrmann's plea, particularly when others also came forward. By allowing him to limit his prison exposure to only three years, the government has merely allowed him to

evade true responsibility. If he were truly "accepting responsibility", he would have come to this Court like a contrite man and plead guilty to at least some of the actual crimes he committed, not the minimal "slap on the wrist" misprision charge he negotiated to escape paying the price.

At trial, Lehrmann testified, as he was required to do under his plea agreement. His testimony, however, featured several smirks and laughs, along with some outright fabrications, including where he parked his vehicle upon arrival at the scene, testimony which was easily disproven through use of the videotape exhibit. Yet the government's evaluation of Lehrmann's status, despite his commission of all of the acts Kaufman committed, is that an *even lower* 18 month sentence would be appropriate. In the government's Rule 35 motion, Rec. Doc. #57 in Mr. Lehrmann's criminal case, the government praised Lehrmann's cooperation, and also took into account "the severity of Mr. Lehrmann's offense" to ask U. S. District Judge Lance M. Africk to reduce Mr. Lehrmann's already incredibly low maximum statutory sentence of 36 months to a mere 18 months,[40] all the while acknowledging that "Mr. Lehrmann had participated in serious crimes involving a massive betrayal of public trust" – in fact the same crimes Mr. Kaufman was found guilty of perpetrating. The government's acceptance of Lehrmann's exposure to a misprision plea of three years maximum sets the bar very low for other such similar conduct in this case, and the government's willingness to allow Mr. Lehrmann to serve only 18 months of that in prison is telling, and unfortunate. Moreover, he was not ordered to pay restitution for these crimes he admitted he committed.

---

[40] Judge Africk refused to reduce Lehrmann's sentence from the 3-year statutory maximum, indicating that Lehrmann had already received significant benefit in his plea to misprision.

Is there any real doubt that Mr. Lehrmann's crimes and conduct are more than simply knowing of a felony and failing to report it? It seems that to say so requires one to go through the looking glass or down the rabbit hole.

### 2. **Kenneth Bryan**

The government also called as a witness at trial Officer Kenneth Bryan, who rode in the back of the Budget rental truck from the Crystal Palace to the Danziger Bridge on September 4, 2005. Mr. Bryan testified that he heard gunshots prior to the truck stopping and other officers exiting the rear of the truck. Bryan testified that he was scared and remained on the floor of the truck until the shooting stopped. He witnessed Officer Ignatius Hills fire his weapon twice at a fleeing 14-year old, but said nothing about that to his ranking officers nor to any other authorities. To make matters worse, when the shooting stopped, Kenneth Bryan then exited the truck after the 14-year old had been apprehended and handcuffed, whereupon Mr. Bryan quite courageously (pardon the sarcasm) approached the cuffed 14-year old and punched him in the face. Amazingly, the government has brought no charges against Officer Bryan for violating Leonard Bartholomew III's civil rights, but has offered his testimony before the jury at trial as truthful. Again, the prosecutorial discretion in the treatment of Mr. Bryan's conduct confounds this Court.

### 3. **Ignatius Hills**

Officer Ignatius Hills also rode in the back of the Budget rental truck from the Crystal Palace to the Danziger Bridge. Unlike other officers present, he did not exit the truck, fearing the gunfire

41

he might face. Instead, Officer Hills remained in the back of the truck until the gunfire ceased,[41] whereupon he saw 14-year old Leonard Bartholomew III running down the bridge, his back to the rear of the truck. Ignatius Hills took that opportunity to fire his side arm twice at the fleeing teenager, while Officer Hills remained in the safety of the rear of the truck. But for the grace of God, along with the fact that Ignatius Hills is apparently a lousy marksman, Leonard Bartholomew III survived and was physically uninjured, except for the aforementioned punch to the face while cuffed, administered by Kenneth Bryan. Ignatius Hills sought out the government to enter a plea, and was afforded by the government the opportunity to plead guilty to conspiring to obstruct justice (18 U.S.C. § 371) in the investigation of the Danziger Bridge shooting and failing to report a felony crime, which when combined allow for a *maximum* of eight years in jail. When compared to the minimum sentences to be levied against these defendants today, it is difficult to imagine how Officer Hills should benefit so greatly solely as a result of his cowardice in failing to exit the truck, and his poor marksmanship in failing to hit the target he so wished to strike. But eight years was the statutory cap, and he received a 6½ year sentence despite the fact that the government sought an even lesser sentence of a paltry four years, praising Mr. Hills as someone who "accepted responsibility for his actions and fully cooperated with the government's investigation", finding his testimony to be "honest and straightforward." The government believed that a sentence of only four years, without payment of any restitution to any victim, would balance the severity of Mr. Hills' offenses of firing his gun at an innocent unarmed fleeing 14-year old and participating in a

---

[41] The initial gunfire Hills heard, according to the government's theory, was that of the driver of the truck, Officer Hunter, who claims he fired "warning shots" as the truck pulled up to the scene.

conspiracy to cover up such grave actions versus the value of his cooperation. So instead of aiding and abetting these four defendants found guilty for violating civil rights by firing weapons on the bridge, all of whom face a minimum consecutive sentence of at least 35 years, the government would have Hills serve only four years in prison. U. S. District Judge Martin L.C. Feldman wisely rejected the government's suggestion, but still Mr. Hills received only six and a half years[42] for his aiding and abetting Bowen, Gisevius, Villavaso and Faulcon, and participating with them in the conspiracy to cover it up, all of which he admitted from the witness stand.

### 4. Michael Hunter

Michael Hunter drove the Budget rental truck to the Danziger Bridge on September 4, 2005. He testified at trial: Mr. Hunter's cavalier approach to his NOPD job was that it allowed him to consider a disciplinary suspension without pay to be like a vacation (Hunter testimony, p. 5, lines 10-14). With that kind of attitude, Mr. Hunter approached the bridge and, without announcing to any of his fellow officers his intention to do so, violated one of the most basic and fundamental principles of law enforcement firearm use: he said he fired "warning" shots out of the window of the truck as it moved into position on the Danziger Bridge. Indeed, it would be fair to say that, along with Officer Jennifer Dupree's urgent call and description of the "108 – officers down", Hunter's warning shots were the spark in the tinder box without which this event would probably never have happened.[43] Mr. Hunter also exited the Budget rental truck first and began firing his side arm, the

---

[42]     Judge Feldman's sentence was at the top of the guideline range.

[43]     Only defendant Bowen was in the cab area of the truck. The other NOPD officers (including defendants Gisevius, Faulcon and Villavaso) were traveling in the rear cargo area and could only see where the truck had been out of the open rear door. Thus they traveled to the scene on the basis of the "108 –

small caliber Glock, in the direction up the bridge likely striking Ronald Madison first as Madison fled with his brother down the west side of the bridge, causing him to clutch his upper left torso.[44]

On April 7, 2010, the government allowed Mr. Hunter to plead guilty to a violation of 18 U.S.C. § 371 (conspiracy to obstruct justice) and a violation of 18 U.S.C. § 4 (misprision of a felony), exposing him to a *maximum* sentence of only eight years, all of which he received from Judge Vance on December 1, 2010. Hunter testified at this trial, though his testimony too was laced with obvious untruths, convenient memory lapses, and parlous fabrications useful to the prosecution. At the time he was sentenced, U. S. District Judge Sarah S. Vance stated: "It is hard to imagine a more profound breach of public trust than what happened here." She further described Hunter's actions as "a moral outrage" and "appalling perversion" and "savagery." Nonetheless, the government thereafter filed a Rule 35 motion seeking to reduce his already severely minimized criminal exposure. In its Rule 35 motion, which is Rec. Doc. 45 in the record of his prosecution (USDC-EDLA No. 10cr86), the government lauded Hunter's cooperation and honesty, about which this Court has already commented in Rec. Doc. 593, and sought to reduce his sentence from 8 years to 5 years. Despite the urging of the government, Judge Vance wisely refused to reduce Mr. Hunter's sentence, stating:

> Because I believe that the 8 year sentence already *over-rewards* him for his cooperation, I will not reduce his sentence any further. [italics added]

officers down" radio call, and could hear gunshots (Hunter's?) at close range ahead of them before exiting the truck to respond.

[44]     At trial, the small caliber shots that struck Ronald Madison were not ballistically attributed to the weapon of any of these 4 defendants. Hunter is the only other person on the video firing such a weapon, and he is doing so in the direction of the Madison brothers.

Judge Vance found that Hunter's cooperation "was the product of cold calculation", and that his trial testimony was "inconsistent" and "self-serving", particularly when compared to the Factual Basis he signed in connection with his guilty plea. Judge Vance expressly questioned how much Hunter truly accepted responsibility for his actions, and again pointed out that Hunter got the benefit of his bargain up front under which she described as "a highly generous plea agreement." Again, no restitution to the victims was sought or ordered.

Hunter committed the same acts of aiding and abetting that were committed by Bowen, Gisevius, Villavaso and Faulcon in this case, who face statutory minimum sentences. His flagitious conduct is breath-taking; the government's decision not to charge him accordingly and to simply allow him to evade true responsibility, while pursuing decades of incarceration against others involved to the same or lesser extent, remains unsettling, to say the least.

### 5. Michael Lohman

Mike Lohman's trial testimony may have been the most convincing amongst those who pled. He was a well-respected lieutenant in the New Orleans Police Department, and had worked his way up the ranks by compiling an almost spotless record. His role in this tragedy, and the crimes to which he has plead guilty, are thus particularly troubling to the Court. Mr. Lohman was the highest ranking officer involved, and was the single most powerful person to have prevented these crimes, and to have reported them accordingly. Instead, he was the leader of the conspiracy. Mr. Lohman's responsibilities were great, and he failed his department, his profession, his colleagues, his community, and his family and friends. Most importantly, he failed himself in tragic fashion.

Mr. Lohman supervised defendant Archie Kaufman, who was a sergeant underneath Mr. Lohman. It was Lohman who ordered Kaufman to handle the Danziger shooting investigation, after "Central Homicide" could not do so, as was the usual pre-Katrina practice.[45] Mr. Lohman not only was aware of each and every one of the criminal acts Mr. Kaufman committed, he approved of them, and further enhanced and aggravated them by writing his own 17-page fictional account of an event at which he was not even personally present. As far as "cover ups" go, Lohman was the ringleader, the consigliere, the chief executive officer when it comes to engineering the incident we now refer to as "Danziger." The buck started and stopped with him. All he had to say was "no", or "stop." He did not. Moreover, he was not the first person to plead guilty, but waited for another lower level employee, Mr. Lehrmann, to do so.

Although the government seeks a sentence of 20 years for Mr. Kaufman, it cut a deal with Mr. Lohman to limit his prison exposure, at a *maximum*, to five years. The government allowed Mr. Lohman to plead guilty to a violation of 18 U.S.C. § 371 (conspiracy to obstruct justice), despite the fact that he could have been charged with virtually everything Mr. Kaufman had been charged with; and despite the fact that Lohman's authoritative role in the cover-up exceeded that of Kaufman, Lehrmann, and others.

---

[45]     It is undisputed from the trial evidence that "Cold Case" (or "Central Homicide"), and not the 7th District, had exclusive responsibility for all NOPD police-involved firearm discharges at the time of Hurricane Katrina. When finally reached on the morning of September 4, 2005, "Central Homicide" advised that it would not (and could not) respond to the Danziger shootings, that it was under water, and that no one from that division would handle the matter. Lt. Lohman then turned to Sgt. Kaufman, a detective in the NOPD 7th District, and appointed him to conduct the "investigation."

Lohman was not sentenced to the maximum of five years, despite the gravity and breadth of his criminal transgressions, but was sentenced to 48 months, or four years. In receiving this reduced sentence, Lohman was aided by the government, who admitted that the offense Lohman committed carried a sentence that warrants, under the Sentencing Guidelines, a sentence that *exceeds* the five year statutory maximum to which the Court was limited. The government also found that Lohman, while supervising the cover-up as the ranking lieutenant, sought to exculpate involved police officers by claiming that two of the surviving civilians had instigated the shooting. See Rec. Doc. 56 in *United States v. Lohman*, USDC-EDLA No. 10cr32, specifically Page 3. Although the government describes the gravity of the offense to which he plead guilty, the government does not point out in the pleading it filed on his behalf that he committed, or aided and abetted in the commission, of each and every one of the crimes for which defendant Kaufman was convicted: to be specific, Lohman plead guilty to what was described in Count 11 in this trial, and he and the government admit that he committed Counts 12 and 13, regarding the prosecution of Jose Holmes and Lance Madison, was fully apprised of and participated in the falsification of evidence in Count 14, the obstruction of justice concerning the firearm in Count 15; he admitted at trial that he made false statements to the FBI, as described in Count 16; he testified that he knew about and participated in the falsification of victim statements in Count 17; and made false statements to the FBI regarding victim statements in Count 18; and he knew about and participated in the fabrication of witnesses, and making false statements about them in support of such fabrication to the FBI, in Counts 24 and 25. He, too, was forgiven any restitution payable to the victims of his crimes, particularly Jose Holmes, whom he falsely accused, and Lance Madison, who sat in jail for several weeks after being falsely accused.

47

Nonetheless, the government argues now that Kaufman should be sent to jail for twenty (20) years. And although the government agreed to cap Lt. Lohman's exposure to prison to 5 years, it further argued that he should spend *only 2 years*[46] actually in prison though he was of superior rank and was clearly the leader of the conspiracy. Thus the government would have Sgt. Kaufman serve *ten (10) times* the jail time of his commanding officer and leader of the conspiracy, even though Kaufman was not involved until Lt. Lohman ordered him to begin the "investigation." While the Court recognizes and supports rewarding defendants who accept responsibility, enter guilty pleas, and cooperate with the prosecution by assisting in the prosecution of other wrongdoers, this amounts to a 90 per cent decrease from the 20 years the government would have Kaufman serve. It is quite frankly shocking that the government so grossly discounted such serious and grave criminal conduct by rewarding so generously the one person in command who could have stopped it at its inception. Of course, this plays no small role in the Court's consideration of Mr. Kaufman's sentence. The government's view of these criminal acts is heard loud and clear in how the government treated others, like Lohman and Lehrmann, who engaged in the very same criminal conduct. Though Kaufman does not get the benefit of having entered a plea and accepting responsibility, he also will not be sentenced to a term so extraordinary for committing the same acts as Lohman and Lehrmann. The disparity under § 3553(a)(6) would simply be too great. His sentence will reflect, by law, that afforded defendant Lohman and defendant Lehrmann.

---

[46]     U. S. District Judge Ivan L.R. Lemelle refused to follow the government's suggested leniency in sentencing Lt. Lohman, and sentenced him to double what the government sought.

### 6.     Robert Barrios

Perhaps the biggest winner in the plea bargain sweepstakes is Robert Barrios. Robert Barrios is one of the so-called "Danziger Seven", the name given to the group of officers who purportedly exited the truck and fired their weapons on the bridge on September 4, 2005. He admitted he had done so, and enthusiastically included himself in the original group who responded to the question of "who discharged a weapon?", shortly after the occurrence on the very day of the shooting. On that day, Barrios was one of only two people armed with a shotgun, defendant Robert Faulcon being the other. Later, after Barrios determined that he and the other shooters might well be in some trouble as a result of the erroneous shootings, Barrios conferred with Mr. Glenn Madison, a ballistics officer with the NOPD, to answer a simple question: Could the ammunition from a shotgun blast be traced to a particular shotgun? Officer Madison, who testified at trial, indicated that it could not, which opened the door for Barrios to then change his story so as to absolve himself of responsibility for any of the shootings: he simply denied he fired his weapon at all, thus allowing the government at trial to attribute any shotgun discharge to defendant Robert Faulcon.

On April 28, 2010, the government allowed Barrios to enter a guilty plea to conspiring to obstruct justice, 18 U.S.C. § 371, exposing him to a *maximum* five year sentence. And while the government secured Mr. Barrios' cooperation, it, curiously enough, declined to call him as a witness at trial in its case-in-chief.

At trial, Barrios was called as a witness by the defendants. His shy low-key demeanor on the stand was belied by his loud, aggressive, argumentative tone on a tape recording he made, at the behest of the government, with his former partner, defendant Anthony Villavaso. Despite Barrios'

49

fanatical urgings, defendant Villavaso refused to say that he saw no guns on the Danziger Bridge, but remained steadfast in what he perceived that morning.

At trial, FBI Special Agent William Bezak described Barrios' testimony and cooperation as "odd", meaning that he somehow found it strange that Barrios would have originally admitted to firing his weapon, as opposed to denying it. The undersigned does not find Barrios' conduct and testimony "odd" at all. In fact, Barrios' conduct is entirely consistent with one who simply lies to get out of trouble. What is "odd" is that he was allowed to do so.

It is appropriate now to discuss James Brissette, whose life was tragically ended on September 4, 2005. Although in its verdict on Count 1, the jury found that James Brissette did, of course, die as a result of the violation of his civil rights, his civil rights were violated exclusively through the use of firearms as the instrumentality – in other words, he was not beaten, punched, or stabbed; only guns were used, and then by several individuals, including four of the defendants here but also Mr. Barrios, Mr. Hunter and others. However, the jury found as a matter of fact that specifically none of these four defendants, by name on an individualized basis, caused the death of James Brissette, as clearly indicated by the jury in its verdict answers to Questions 2(a)-2(d). Notwithstanding the government's evidence, including expert ballistics testimony (which the jury apparently found unconvincing) and lack of shotgun shells (though many weeks had passed before they were sought), the jury found as a matter of fact,[47] beyond a reasonable doubt, that each man – Bowen, Gisevius, Faulcon, and Villavaso – did **not** cause the death of James Brissette. The Court

---

[47] This question, as propounded to the jury by this Court, is not a "guilty/not guilty" inquiry as to whether the government met its burden of proof. It asks a relevant fact question, i.e., whether each defendant did or did not commit an act as a matter of fact.

further cites to the evidence at trial, and further quotes from the stipulation reached in the subsequent *Dugue* trial regarding Dr. Dimaio's testimony: "James Brissette was also struck in the back of the head by three shotgun pellets, two of which lodged in his brain <u>and caused his death</u>.  James also had shotgun pellets in his buttocks and his hip, which likely came from this same shotgun blast from behind."  It is well established that only two men had shotguns on the bridge: Robert Barrios and Robert Faulcon.  Because the testifying pathologist and coroner indicated that the kill shot on James Brissette came from a shotgun, and excluding Robert Faulcon as the jury unequivocally did, the only remaining possibility is that the fatal shots came from Robert Barrios' shotgun, if we are to accept the jury's verdict on this count, which the Court has done.  This fact finding is supported by the factual evidence,[48] primarily Mr. Barrios' initial spontaneous and express admission that he did shoot James Brissette, who (according to Barrios) spun around when hit.  The government will no doubt maintain that Mr. Faulcon killed James Brissette.  The undersigned – and most importantly, the jury – find that very doubtful.  It is clear from the jury's verdict that none of the defendants, specifically Bowen, Gisevius, Faulcon, nor Villavaso, fired the shots that Dr. Dimaio says killed James Brissette.  But the obvious only other person who could have killed James Brissette did not get 10 years, 35 years or 60 years, as the defendants in this case are facing.

On December 1, 2011, U. S. District Judge Eldon E. Fallon sentenced Robert Barrios to the statutory *maximum* of 60 months, or five years, in prison.  18 U.S.C. § 371.  Mr. Barrios, too, was not required to pay restitution to anyone.  Perhaps recognizing that even considering that Barrios got the statutory maximum he could possibly get, the government did not argue for a reduced

---

[48]     See, e.g., *United States v. Valles,* 484 F.3d 745, 759 (5th Cir. 2007).

sentence based upon his cooperation (unlike the other cooperating defendants). In fact, at Mr. Barrios' sentencing, the government conceded that Barrios' assistance was of little value, since he was the last to plead and had nothing new which was not previously known to the government. But instead of facing a statutory *minimum* of 35 years like the defendants in this case, particularly his partner Mr. Villavaso (whose shots were not shown to have hit anyone), the government has allowed Barrios at least 30 years off of this minimum sentence, for reasons unbeknownst to the Court, and much to the Court's dismay. The plea deal with Mr. Barrios, along with that received by Mr. Hunter, have devalued the criminality of the actions committed by them.

As to all of these other cooperating defendants, the Court recognizes and supports the general idea of somewhat lesser sentences than they would have gotten had they not entered guilty pleas. This reduction, however, should come from that actual sentence which each might have received for the crimes he actually committed, i.e. "acceptance of responsibility." These are very serious crimes indeed, and any attempt to minimize the gravity of these crimes by re-labeling them, manipulating them, or most outrageously, simply ignoring the actions of these defendants, is irresponsible. Criminal activity, admitted from the mouths of the men who committed it, should not be merely clay in the hands of a clever prosecutor, regardless of the crime actually committed.

Anton Chekhov once said: "You will not become a saint through other people's sins." Likewise, these cooperating defendants are not innocent of the serious crimes they committed merely because they testified regarding other people's crimes. The government, however, has attempted to make it so. Instead, this process has been warped by the decision to obfuscate their real criminal activity, grossly reduce their sentences prescribed by Congress through artfully clever and

52

expedient pleading in their respective indictments (or bills), all of which results in usurpation of this Court's role in determining the appropriate reduction of sentences proscribed for such criminal conduct.[49]  The negotiated prison terms of these "through-the-looking-glass" plea deals, which tie the hands of this Court and prevent careful, considered and prudent sentencing across-the-board, are an affront to the Court and a disservice to this community.

At a bench conference during the presentation of the defendants' case-in-chief, the government indicated it might file perjury charges against certain persons named as defense witnesses, based on prior conduct.  Such is the government's prerogative, if warranted by the facts. But each of the testifying plea-deal defendants obligated himself to testify truthfully and honestly as part of their plea deals.  After seeing them testify at trial, however, the Court has concerns about whether some truly did so (as already stated herein).  The transcript of this trial will always be haunted by FBI Agent Bill Bezak's disconcerting characterization of Lieutenant Lohman's testimony, indicating "It's Mike Lohman's truth."  (July 21, 2011 Transcript, p. 21, lines 2-14; see also p. 17, line 20 through p. 18, line 9; p. 23, line 22 through p. 24, line 5; and p. 36, line 13 through p. 37, line 6.)  Agent Bezak tried to explain away the materially inconsistent testimony of his cooperating defendants as follows:  When asked "How many different truths can there be?", Agent Bezak responded  "Every person has their own memory, recollection, interpretation of events."  (p.

---

[49]     The government maintains, and the Court agrees, that plea deals were necessary to "break the case."  The issue, however, is not whether plea deals were appropriate, but rather the overly generous terms of those plea deals, especially the statutory maximums for the crimes to which they were allowed to plead, for purposes of § 3553(a)(6).  To cap one man's prison exposure to five years (as with Barrios) or eight years (as with Hunter) in order to charge similarly-situated criminal defendants with multiple "stacked" § 924(c) counts carrying minimum 35 and 60 years in prison strikes the Court as abusive and improper.

21, lines 16-17.)  Can false testimony be excused as a mere "interpretation of events?"  There cannot be individualized "truths."  Prevarication of witnesses cannot be – can never be – a means to reach the ends of justice.

On Saturday, September 3, 2011 (ironically almost 6 years to the date of these shootings), the U.S. Attorney for the Eastern District of Louisiana was quoted in the local newspaper regarding sentencing in another matter.  He correctly said:  "Any deceit, obfuscation, and certainly lying to the jury, not only triggers a higher sentencing guidelines but also eviscerates the chance of anyone getting assistance in sentencing.  It angers the court."  The undersigned certainly agrees that such conduct surely angers the court.  In this case, however, some of the testimony of the cooperating former NOPD officers involved deceit and obfuscation before the jury – but they received very low maximum sentences and had the government vouching for them, contrary to the U.S. Attorney's statement.[50]  Lying to cover crimes, assuming fake names, and calling witnesses to lie to cover crimes, is most reprehensible; sentences will be imposed.  Likewise, using liars lying to convict liars is no way to pursue justice.[51]  Perjured testimony, in both civil and criminal cases, should normally

---

[50]  After the sentencing hearing on April 4, 2012, wherein the undersigned orally provided its reasons for these sentences, Assistant United States Attorney General Thomas Perez, head of the Justice Department's Civil Rights Division, glibly responded: "You don't go to the witness store to pick out your witnesses."  Nonetheless, whether at "the witness store" or on the black market, these witnesses – the cooperating defendants – were purchased, bought and paid for with the exchange of and forgiveness of the lengthy statutory minimums of § 924(c) warranting decades in prison.  Mr. Perez' comment misses the point.

[51]  This statement, read in open court, was frequently misquoted in a materially incorrect way after the April 4, 2012 sentencing hearing: The undersigned *never* said, "Using liars to convict liars is no way to pursue justice."  The Court's concern was not that co-conspirators who lied and then plead guilty were called as government witnesses; such is not uncommon.  Rather, the concern is whether those witnesses told the truth when testifying at trial, or had an incentive otherwise.  See, e.g., pp. 17-18, *infra*.  Hence, the Court's statement as it appears in the April 4, 2012 transcript: "Using liars _lying_ to convict liars is no way to pursue justice."

be referred to the U.S. Attorney's Office for further consideration and prosecution. To whom should those perjury charges be referrred, if it occurred during the government's case-in-chief? Unfortunately, to support its postulate, some fabrications, or "interpretations", were accepted by the government; others might be prosecuted. As U.S. Supreme Court Justice George Sutherland wrote over 75 years ago: "While the prosecutor may strike hard blows, he is not at liberty to strike foul ones."[52]

It has been said that the unprecedented enormity of the disaster of Hurricane Katrina should be a factor in considering sentences herein. Without a doubt, the day of Hurricane Katrina and the weeks and months that followed, were the greatest weather-related disaster to affect the main land in United States history. Recently, the Fifth Circuit recognized: "Indeed if Katrina was not an emergency, it is difficult to imagine any set of facts that would fit that description."[53] As shocking and horrid as the defendants' actions were on September 4, 2005, and in the months and years that followed, the context of Katrina and its aftermath cannot be ignored. Indeed, photographs, videotape, television footage, oral and written accounts, and any other means of relating or describing the pervasiveness of the disaster and extraordinarily exigent circumstances is inadequate. In short, one would have to be here in the metropolitan New Orleans area that very morning to understand the sheer adversity and enormous loss. This in no way excuses any of the criminal conduct herein, however, it must be taken into account in determining the total length of the sentences rendered in this case.

---

[52]     *Berger v. United States,* 295 U.S. 78, 88 (1935).

[53]     *Waganfield v. Gusman,* #11-30081

For all of the reasons stated thus far, the Court will consider the totality of the circumstances as well as its sentencing responsibilities today, and grant a variance. Therefore, **IT IS ORDERED** that the following sentences are imposed on the remaining counts:

Defendant Kenneth Bowen is sentenced to a term of 60 months in prison for each of Counts 1, 3-6, 11,19, and 20, all terms to run concurrent; for a total of 40 years in prison.

Defendant Robert Gisevius is sentenced to a term of 60 months in prison for each of Counts 1, 3-6, 11 and 21, all terms to run concurrent; for a total of 40 years in prison.

Defendant Robert Faulcon is sentenced to a term of 60 months in prison for each of Counts 1, 3-6, 8, 11 and 22, all terms to run concurrent; for a total of 65 years in prison.

Defendant Anthony Villavaso is sentenced to a term of 36 months in prison for each of Counts 1, 3-6, 11 and 23, all terms to run concurrent; for a total of 38 years in prison.

Defendant Arthur "Archie" Kaufman is sentenced as follows:

For Counts 11, 14-18, and 24-25, 72 months in prison; for Count 12, 41 months in prison; and for Count 13, 51 months in prison; all counts to run concurrent to each other. As to some of these counts, this sentence represents a variance, which the Court finds appropriate under *Booker* and *Fanfan*, as well as the previously cited Supreme Court case of *United States v. Gall* and the Fifth Circuit case of *United States v. Duarte*. For all of the reasons I have previously stated today, particularly the government's evaluation of these crimes as assessed against Lieutenant Lohman, the leader of the conspiracy, and Mr. Lehrmann, who participated side-by-side, and both of whom committed all the crimes Mr. Kaufman committed. The variance is also supported by a very important letter received by the Court from Mr. William J. Renton, Jr., which is made part of the

record. Mr. Renton is the retired Special-Agent-in-Charge, or SAC, of the Drug Enforcement Administration's New Orleans Field Division for a number of years. Mr. Renton's letter, dated October 27, 2011, provides great support for this Court's variance with regard to Mr. Kaufman's sentence. The Court relies on it heavily, just as it relied upon Special Agent Renton's important and valuable work for the DEA over a number of years. In fact, the Department of Justice, the U.S. Attorney's Office for the Eastern District of Louisiana, the FBI, and any number of law enforcement agencies relied upon Special Agent Renton's leadership and quite capable execution of his responsibility as the superior officer of the DEA in this Division. The undersigned, and the other judges of this Court, have observed and worked closely with Special Agent Renton over these years. In fact, the undersigned personally relied upon Special Agent Renton's representations with regard to the use of incarcerated criminal defendants to be released to participate in undercover DEA operations. On every occasion, Special Agent Renton's representation proved to be true, accurate, and rock solid. DEA Special-Agent-in-Charge William J. Renton, Jr.'s correspondence alone provides support for the variance the Court has afforded defendant Kaufman in sentencing him today. So among the non-shooting "cover-up" conspirators, defendant Kaufman will serve 6 years; Lieutenant Lohman, the ranking officer and leader of the conspiracy, will serve 4 years; and defendant Lehrmann, who participated in each criminal act as the other two, will serve 3 years. These sentences are, in the Court's opinion, aligned.

Pursuant to 18 U.S.C. § 3553(c)(1), because the minimum and the maximum of the guidelines sentencing ranges for **defendants Bowen, Bisevius, Faulcon, and Villavaso** exceed 24 months, the Court, at the time of sentencing, is required to state, in open court, the reason(s) for

imposing a sentence at a particular point within the range.  The Court has done so.  These sentences reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses of which each defendant has been convicted.

The Court finds that **defendants Bowen**, **Gisevius**, **Faulcon, Villavaso**, and **Kaufman** do not have the ability to pay a fine.  Accordingly, the Court waives the fine requirement for these defendants.

**IT IS FURTHER ORDERED** that:

(1)	Defendant **Bowen** shall pay to the United States a special assessment in the amount of $1,000, representing $100 per count, which shall be due immediately.

(2)	Defendant **Gisevius** shall pay to the United States a special assessment in the amount of $900, representing $100 per count, which shall be due immediately.

(3)	Defendant **Faulcon** shall pay to the United States a special assessment in the amount of $1,100, representing $100 per count, which shall be due immediately.

(4)	Defendant **Villavaso** shall pay to the United States a special assessment in the amount of $900, representing $100 per count, which shall be due immediately.

(5)	Defendant **Kaufman** shall pay to the United States a special assessment in the amount of $1,000, representing $100 per count, which shall be due immediately.

**Regarding supervised release:**

(1)	Upon release from imprisonment, defendant **Bowen** shall be placed on supervised release for a term of three (3)  years as to each of Counts 1, 2, 3, 4, 5, 6, 7, 11, 19 and 20, with all terms to run concurrently.

(2)     Upon release from imprisonment, defendant **Gisevius** shall be placed on supervised release for a term of three (3)  years as to each of Counts 1, 2, 3, 4, 5, 6, 7, 11 and 21, with all terms to run concurrently.

(3)     Upon release from imprisonment, defendant **Faulcon** shall be placed on supervised release for a term of three (3) years as to Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, and 22, with all terms to run concurrently.

(4)     Upon release from imprisonment, defendant **Villavaso**  shall be placed on supervised release for a term of three (3) years as to Counts 1, 2, 3, 4, 5, 6, 7, 11, and 23, with all terms to run concurrently.

(5)     Upon release from imprisonment, defendant **Kaufman** shall be placed on supervised release for a term of three (3) years as to Counts  11, 12, 13, 14, 15, 16, 17, 18, 24, and 25, with all terms to run concurrently.

Within 72 hours of his release from the custody of the Bureau of Prisons, each defendant shall report to the probation office in the district to which that defendant is released.

With respect to each defendant – Bowen, Gisevius, Faulcon, Villavaso, and Kaufman:  while on supervised release, each shall not commit another federal, state, or local crime, shall not possess a firearm, shall not possess a controlled substance, and shall comply with the mandatory conditions required by 18 U.S.C. § 3583 and Section 5d1.3 of the United States Sentencing Guidelines, as well as the standard conditions that have been adopted by this Court.  In addition, the following special conditions are imposed on each of you:

1.      Participation in the orientation and life skills program as directed by the probation officer.

2.      Payment of the special assessment imposed by this Judgment if it remains unpaid at the commencement of the term of supervised release.

All of the defendants are advised that their failure to comply with any of the mandatory, standard, or special conditions of supervised release, including the requirement that each pay the special assessment, may result in revocation of supervised release and imprisonment.

Pursuant to 18 U.S.C. § 3583(f), it is further ordered that the probation officer provide each defendant with a written statement setting forth all of the conditions to which his term of supervised release is subject.

**IT IS FURTHER ORDERED** that each defendant shall submit to the collection of a DNA sample pursuant to the DNA Analysis Backlog Elimination Act of 2000**,** as amended by Section 203(b) of the Justice For All Act of 2004.

Hopefully, these sentencings will bring further closure to the victims of these crimes, and to this City itself, for a truly morose chapter in the history of our police department and our city. Aside from the severe personal injuries suffered by the victims, it should be noted that the acts of these defendants and the cooperating defendants have marred the standing of all good and loyal police officers who have ever served this City with honor and distinction. In fact, many officers performed their duties after Hurricane Katrina, rescuing people, securing property and keeping the peace, without any expectation or desire whatsoever to be considered "heroes." They should be

thanked, in recognition that not all NOPD officers are dishonest or guilty of wrongdoing.  Most are not.  In fact, even in this case, some of the defendants and cooperating defendants performed admirable acts in the aftermath of Hurricane Katrina, which are now unfortunately overshadowed by these convictions.

New Orleans, Louisiana, this 11<u>th</u> day of <u>April</u>, 2012.

_____
**KURT D. ENGELHARDT**
**United States District Judge**